**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SEBASTIAN J. PALLADINO | ) |
|      Plaintiff | ) |
| | ) CIVIL ACTION |
|   v | ) |
| | ) |
| HSBC BANK, U.S.A, N.A.; FREMONT HOME LOAN TRUST 2006 D; REAL INDUSTRY, INC., F/K/A FREMONT GENERAL CORP., F/K/A SIGNATURE GROUP HOLDINGS, F/K/A FREMONT REORGANIZING CORPORATION, F/K/A FREMONT INVESTMENT AND LOAN; PIERCE AND ASSOCIATES, P.C; LOCKE LORD LLP; OCWEN LOAN SERVICING, LLC; WELLS FARGO BANK, N.A.; | |
|      Defendants | |

## COMPLAINT

NOW COMES SEBASTIAN J. PALLADINO ("Mr. Palladino"), by and through his attorneys of, the LAW OFFICE OF HERBERT HILL and complaining against the Defendants states as follows:

## NATURE OF THE CASE

1.      This is an action by Mr. Palladino seeking damages and costs against the Defendants scheme to defraud and take Mr. Palladino's home by a wrongful foreclosure which violates federal and state laws.

2.      As alleged below, Defendants conduct violates the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) ("Count I"),  the RICO conspiracy provision, 18 U.S.C. § 1962(d) ("Count II"), Conspiracy ("COUNT III"), Aiding and Abetting (COUNT IV), Truth in Lending Act ("TILA") 15 U.S.C § 1601 *et seq* (Count V), Home Ownership Equity Protection Act ("HOEPA") (Count VI), Home Ownership Equity Protection Act ("HOEPA") 15 U.S.C. § 1639 *et seq* (Count VII), Illinois Consumer Fraud and Deceptive

Business Practices Act ("ICFA") 815 ILCS 505/2 *et. seq*, (Count VIII); and Intentional Infliction

of Emotional Distress ("COUNT IX") all associated with a foreclosure action.

## JURISDICTION AND VENUE

3.      Subject matter jurisdiction is conferred upon this Court by 18 U.S.C. § 1964(c),

15 U.S.C. § 1640(e), 28 U.S.C. § 1331, and 28 U.S.C. § 1337. The Court supplemental

jurisdiction over state law claims under 28 U.S.C. §1367.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 as Defendants conduct

business in the Northern District of Illinois and all of the events or omissions giving rise to the

claims occurred within the Northern District of Illinois.

## PARTIES

5.      Plaintiff SEBASTIAN J. PALLADINO ("Mr. Palladino") is a natural person

residing within this Court's jurisdiction at 917 Heathrow Lane, Naperville, IL 60540.

6.      Non Party MARCELLA PALLADINO ("Ms. Palladino") is a natural person

residing in this Court's jurisdiction.

7.      Defendant HSBC Bank, U.S.A., N.A. ("HSBC") is a national banking association

with its principal place of business in McLean, Virginia. As described below, HSBC, either

directly and/or indirectly through its agents, employees, subsidiaries and/or related companies,

including without limitation HSBC Mortgage Corp., U.S.A, HSBC Bank U.S.A Trust, and

HSBC Mortgage Services, Inc., engaged in transactions related to the securitization of mortgage

loans of real property located within the state of Illinois.

8.      Defendant Real Industry Inc., f/k/a Fremont General Corp., f/k/a Signature Group

Holdings, f/k/a Fremont Reorganizing Corporation f/k/a Fremont Investment and Loan

(hereinafter "Fremont") is a corporation with a principal place of business at 2727 East Imperial Highway, Brea, California, 92821.

9.      Defendant Fremont Home Loan Trust 2006-D, a New York common law trust, formed by the depositor pursuant to the pooling and servicing agreement.

10.      Defendant Fremont Mortgage Securities Corporation with a principal office located at 2727 East Imperial Highway, Brea, California 92821.

11.      Defendant Wells Fargo Bank, N.A. is a national banking association and maintains corporate trust offices located at 9062 Old Annapolis Road, Columbia, Maryland 21045.

12.      Defendant, Pierce & Associates, P.C. ("Pierce") is a corporation that acts as a debt collector, as defined by § 1692a(6) of the FDCPA, because it regularly uses the mails and/or the telephone to collect, or attempt to collect, directly or indirectly, delinquent consumer debts. Pierce's principal purpose is to enforce security interests, and Pierce is thus a debt collector for the purposes of § 1692f (6) as well as under the general definition of a debt collector under this section.

13.      Defendant Jill Rein, is a lawyer who works for Pierce and Associates, P.C. and at all times participated in the scheme on behalf of her employers knowledge of said acts described herein.

14.      Defendant Amber Cowan is an Illinois notary and Supervisor for Pierce and Associates, P.C. and at all times participated in the scheme on behalf of her employer's knowledge of said acts described herein.

15.      Defendant, Locke Lord LLP. ("Locke Lord") is a corporation that acts as a debt collector, as defined by § 1692a(6) of the FDCPA, because it regularly uses the

mails and/or the telephone to collect, or attempt to collect, directly or indirectly, delinquent consumer debts. Locke Lord's principal purpose is to enforce security interests, and Locke Lord is thus a debt collector for the purposes of § 1692f (6) as well as under the general definition of a debt collector under this section.

16. Defendant David Standa, is a lawyer who works for Locke Lord and at all times participated in the scheme to defraud on behalf of his employers knowledge of said acts described herein.

17. Defendant Irina Dashevsky, is a lawyer who works for Locke Lord and at all times participated in the scheme on behalf of her employer's knowledge of said acts described herein.

18. Defendant, Ocwen Loan Servicing, LLC ("Ocwen") is a financial institution with its principal place of business located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33146. Defendant transacts business in Illinois. Defendant's Illinois registered agent is Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

19. Non-Party Defendant, Litton Loan Servicing, LLC ("Litton") is a financial institution with its principal place of business located at 4828 Loop Central Drive, Houston, TX 77081.

20. Defendant Howard R. Handville is an employee or agent of Ocwen and at all times participated in the scheme on behalf of his employers' knowledge of said acts described herein.

**THE SECURITIZATION PROCESS FOR THE FREMONT TRUST 2006 D**

21. The Fremont Trust 2006-D was established pursuant to the Pooling and Servicing Agreement dated November 1, 2006.

22. Financing a home mortgage, at a fundamental level, has not changed much in over a hundred years. Each mortgage loan consists of two parts: (1) a note, evidencing

the debt owed; and (2) a mortgage, evidencing the security interest or collateral.

23. After the Great Depression, the government began purchasing mortgage loans from financial institutions in order to inject more liquidity into the housing market and encourage financial institutions to use that money to make additional mortgage loans.

24. More recently there was the development of the government sponsored securitization market, primarily through Fannie Mae and to a lesser extent Freddie Mac. This was followed by the development of the private non-government sponsored securitization market called "private label" securitization.

25. By pooling thousands of mortgages together, the securitization process transforms transforms relatively locked 30-year financial instruments into very dynamic and liquid financial instruments. Bonds or Mortgage Backed Securities ("MBS") are issued based upon the income stream generated by the pool of mortgages, and then the MBS' are sold to investors all over the world. Meanwhile, the underlying mortgage loans are held in a trust for the benefit of these various investors.

26. Although many entities and persons may be involved in the securitization process and there may be slight variations, the broad framework of the securitization process is always the same. It always includes five distinct actors: (1) the Issuing Entity- (Fremont Home Loan Trust 2006-D); (2); the Depositor -(Fremont Mortgage Securities Corporation); (3) the Sponsor/Originator/Servicer-(Fremont Investment and Loan), (4) the Master Servicer/Trust Administrator/Custodian-(Wells Fargo Bank, N.A.) and (5) the Trustee-HSBC Bank USA, N.A.).

27. More specifically, in the securitization context when Mr. Palladino obtained his loan, Fremont Investment and Loan ("FIL") is supposed to hold Mr. Palladinos' loan during which it collects the mortgage loan payments from him.

28. Then FIL is supposed to sell all rights, titles, and interests of the mortgages and loans to Fremont Mortgage Securities Corporation ("FMSC") who is allegedly acquiring loans for the purpose of depositing the loans into the Fremont Home Loan Trust 2006-D ("Trust").

29. Once FIL has obtained a sufficient number, value and diversity of mortgage loans, it sells those loans to FMSC who in turns assigns and endorses all the mortgages and loans to the trust.

30. Based upon the assumption that the mortgage loan was sold and deposited into the Trust, Mr. Palladino began making payments to the Trust through the Servicer or Master Servicer for the Trust. In this case, Defendant Wells Fargo was the Master Servicer of the Trust, and responsible to ensure that the loans comprising the Trust were properly serviced.

31. Defendant Fremont, Litton and Ocwen were the servicers, and acted under the supervision of Wells Fargo.

32. When Wells Fargo or one of the Servicers collected loan payments from Mr. Palladino, Wells Fargo purportedly transferred those payments, less allowable deductions, to the Trust, who then distributes those payments to each Trust's beneficiaries, the Certificateholders.

33. Therefore, the Trust is primarily administered by two entities: HSBC, the Trustee, who is the "face" of the Trust and the "Master Servicer which is Wells Fargo", who – along with its designated "Servicer" eg... Ocwen, Fremont, Litton – is the "face" of the Trust with borrowers like Mr. Palladino.

### THE DUTIES OF THE MASTER SERVICER, TRUST ADMINISTARATOR AND CUSTODIAN

34. Wells Fargo Bank will act as Master Servicer, Trust Administrator, and Custodian under the pooling and servicing agreement. Wells Fargo Bank is a national banking association

and a wholly-owned subsidiary of Wells Fargo & Company and a diversified financial services company with approximately $482 billion in assets.

35.     As with most trusts, the Pooling and Servicing Agreement ("PSA") provides that the last step in the mortgage conveyance process is the Depositor's conveyance or sale of the mortgage loans to the Trust for the benefit of the Certificateholders.

35.     Under the PSA and its underlying agreements, Defendant Fremont, Litton, and Ocwen, as the Servicer, had a duty to ensure that its mortgage servicing practices (including collection procedures) were in conformance with those of prudent mortgage lending institutions which service similar mortgage loans.

36.     The PSA also imposed a duty on Defendant Wells Fargo, as the Master Servicer, to "monitor the performance of Servicers Fremont, Litton, and Ocwen under the related Servicing Agreements" and to "use its reasonable good faith efforts to cause the Servicer [Fremont] to duly and punctually perform [its] duties and obligations.

37.     As *Trust Administrator*, Wells Fargo Bank also is responsible for securities administration, which includes pool performance calculations, distribution calculations and the preparation of monthly distribution reports. Additionally, Wells Fargo Bank is responsible for the preparation and filing of all REMIC tax returns on behalf of the Trust REMICs or other legal entities formed pursuant to the pooling and servicing agreement and the preparation of monthly reports on Form 10-D, current reports on Form 8-K and annual reports on Form 10-K that are required to be filed with the Securities and Exchange Commission on behalf of the issuing Trust.

38.     According to Wells Fargo, it has been engaged in the business of securities administration since June 30, 1995 and has acted as trust administrator for all previous series of publicly offered mortgage backed certificates issued by the Depositor. As of June 30, 2006, Wells

Fargo was acting as securities administrator with respect to more than $894,773,136,436 of outstanding residential mortgage-backed securities.

39.     The pooling and servicing agreement requires that the Trust Administrator and the Master Servicer at all times be the same person, so long as a Master Servicer is required by the provisions of the pooling and servicing agreement.

40.     As *Custodian*, Wells Fargo is responsible to hold and safeguard the mortgage notes and other contents of the mortgage files on behalf of the Trustee and the Certificateholders.

### FREMONT SUBPRIME LOANS

41.     A loan that is made at a higher interest rate than most other loans. Subprime loans are made to borrowers who do not qualify for ordinary loans because of bad credit history or some other reason. There is a higher risk of default on subprime loans.

42.     In 2007, the Federal Deposit Insurance Corporation (FDIC) found that Fremont was operating without effective risk management policies and procedures in place in relation to its subprime mortgage lending operations. The FDIC determined, among other things, that Fremont had been operating without adequate subprime mortgage loan underwriting criteria, and that it was marketing and extending subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss to the bank.

### ROBO-SIGNING

43.     The national foreclosure crisis has revealed the widespread use by mortgage servicers (including Defendant Wells Fargo, the Master Servicer of the Trust, and Ocwen, the Servicer) of what has infamously become known as "robo-signing." Robo-signing is the practice of signing mortgage assignments, satisfactions and other mortgage related documents in

assembly-line fashion, often with a name other than the affiant's own, and swearing to personal knowledge of facts of which the affiant has no knowledge.

44.     In October 2010, following revelations regarding the widespread use of robo-signed affidavits in foreclosure proceedings throughout the United States, state Attorneys General formed a coalition to investigate the problem. The state Attorneys General subsequently partnered with the federal government in investigating and negotiating a settlement with mortgage servicers, including the Master Servicer of the Trust, Wells Fargo.

45.     According to the Congressional Oversight Panel's November Oversight Report, "Affidavits such as the ones involved in the foreclosure irregularities are statements made under oath and thus clearly fall within the scope of the perjury statutes.

46.     On April 13, 2011, the Federal Reserve Board signed and published twelve consent orders (the "Federal Reserve Consent Orders"), which found that Wells Fargo engaged in "unsafe or unsound practices." In addition, the United States Comptroller of the Currency entered into consent orders with Defendant Wells Fargo. In the OCC Consent Order, the government found that Wells Fargo:

> 1)     Filed or caused to be filed in state courts and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as the ownership of the mortgage note and mortgage in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;

> 2)     Litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time; and

      3)    Failed to sufficiently oversee outside counsel and other party providers handling foreclosure-related services.

47.    Reuters published a special report on July 19, 2011, stating that notwithstanding the servicers' obligations notwithstanding the servicers' obligations under the Federal Reserve and OCC Consent Orders, "Reuters has found at least five that in recent months have filed foreclosure documents of questionable validity including the Trust's Master Servicer, Wells Fargo."

48.    Defendant Ocwen has engaged in similar servicing practices. According to a Consent Order entered with the Consumer Financial Protection Bureau (CFPB) in 2012, it found that Ocwen:

      1)    prepared, executed, notarized, and presented false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments); and

      2)    prepared, executed, notarized, and filed affidavits in foreclosure proceedings, whose affiants lacked personal knowledge of the assertions in the affidavits and did not review any information or documentation to verify the assertions in such affidavits.

49.    On information and belief, and as a result of Defendants' activities in these and other matters, Defendant Wells Fargo and Ocwen filed in county recording or land offices and in courts flawed, misleading, improper and arguably unlawful documents as set forth in the above referenced Consent Orders with regards to Wells Fargo and Ocwen.

50.    In addition to robo-signing, government investigations and reports have revealed other wide-spread servicing breaches and abuses involving misconduct by the servicers of the Trust.

## TOLLING THE STAUTE OF LIMITATIONS
### *Fraudulent Concealment Tolling*

51.    Any applicable statute of limitations have been tolled by Wells Fargo and its Servicers active concealment, denial to produce discovery, and the misleading actions as alleged herein. Mr. Palladino could not have reasonably discovered the true nature of Wells Fargo's actions and its scheme to defraud until discovery was tendered on September 15, 2014 and on September 16, 2015.

52.    Wells Fargo and its servicers are knowingly, affirmatively, and are still actively concealing the true nature of who owns Mr. Palladinos Note and Mortgage, when and if it was assigned, and if so, to whom. Furthermore, they have fraudulently produced an endorsed Note since the start of litigation in the state court foreclosure proceeding.

### *Discovery Rule*

53.    The cause of actions here did not accrue until Mr. Palladino received the Pooling and Servicing Agreement (PSA) on September 16, 2015 and was able to review the PSA and the Free Writing Prospectus and then discovered the fraudulent scheme to steal his property orchestrated by Wells Fargo and its co-conspirators.

### *Estoppel*

54.    Based on the foregoing, Wells Fargo, Ocwen, and Fremont is estopped from relying on any statutes of limitations as a defense in this cause of action.

## STATEMENT OF FACTS

55.    In January 2001, the Palladinos' filed a chapter 13 bankruptcy to consolidate their bills and reduce their monthly obligations.

56.    In January, 2005, the Palladinos' applied to Fremont Investment & Loan ("FIL") for a loan to refinance their existing mortgage. As a condition of the approval, the chapter 13

balance had to be paid off.

57.     FIL approved the Palladinos' loan on February 28, 2005, paid the chapter 13
bankruptcy trustee, thus obtaining a dismissal of the chapter 13.

58.     On or about April or May of 2006, the Palladinos contacted FIL to refinance their
existing mortgage with FIL to lower their monthly mortgage payments.

59.     Mr. Palladino spoke to Troy Malek, an employee at FIL who referred Mr.
Palladino to Ann Wachtel of Maywood mortgage who assisted with the refinance application
process.

60.     Although the intent was for Mr. and Mrs. Palladino to refinance the mortgage as
joint applicants, due to Mr. Palladinos' employment situation and credit card obligations, the loan
could only be approved with Ms. Palladinos' information.

61.     Mr. Palladino faxed Ms. Palladinos' 1003 application, check stubs, W2's and bank
statements to Ann Wachtel at Maywood Mortgage. (attached hereto as Exhibit 1 is a true and
accurate copy of the application sent)

62.     On August 18, 2006, FIL provided a preliminary Truth in Lending disclosure
statement with an 8.229% Annual Percentage Rate. Exhibit 2 (see payment schedule below)

| Payments | Payment | Payments Begin |
|----------|---------|----------------|
| 36 | $1,878.39 | 10/1/06 |
| 323 | $2,803.00 | 10/1/09 |
| 1 | $2,796.00 | 9/1/36 |

63.     On August 28, 2006, FIL approved the Palladinos' for a subprime loan with a
95% Loan to Value ratio, debt-to-income ratio in excess of 80%, and rated them A+.Exhibit 3

64.     The loan was an adjustable rate mortgage (ARM) in the amount of $313,500.00, listing the interest at 7.19% until September 2009 when the interest rate was subject to change every six months, up to a maximum of 13.19%. The monthly payment was $1,878.39 which was calculated as interest only. Exhibit 4

65.     At the closing, the Palladinos' were provided a final 1003 that was different than the original 1003 provided on August 18, 2006. Exhibit 5

| Description of entry | Original 1003 | Final 1003 | Changes |
|---|---|---|---|
| Amount of Existing Lien | $277,089.00 | $197,739.00 | ($79,350.00) |
| Total Assets | $330,400.00 | $660,400.00 | +$330,000.00 |
| Total Liabilities | $305,034.00 | $5,378.00 | ($299,656.00) |
| Net Worth | $25,366.00 | $655,022.00 | +$629,656.00 |
| Fremont I&L Balance | $191,898.84 | $197,739.00 | +$5,840.16 |
| Cap One Auto Finance | $14,541.83 | $14,642.00 | +$100.17 |
| GEMN/Mohawk | no entry | $2,000.00 | +$2,000.00 |
| Schedule of Liabilities | $90,555.00 | $0.00 | ($90,555.00) |
| Mortgages & Liens | $276,898.84 | $197,739.00 | ($79,159.84) |
| Mortgage Payments | $2,277.56 | $1,238.00 | ($1,039.56) |

66.     On August 28, 2006, FIL provided a final Truth in Lending disclosure statement with a 9.320% Annual Percentage Rate. Exhibit 6 (see payment schedule below)

| Payments | Payment | Payments Begin |
|---|---|---|
| 36 | $1,567.50 | 11/1/06 |
| 323 | $2,553.14 | 11/1/09 |
| 1 | $2,551.12 | 10/1/36 |

67.     In March 2007, the Federal Deposit Insurance Corporation ("FDIC") ordered a cease and desist against FIL because it was offering subprime mortgage loans in a way that substantially increased the likelihood of borrower default or other loss to the bank.

68.     On May 5, 2008, FIL filed a foreclosure complaint in DuPage County, case # 2008 CH 1730 through Codilis and Associates, P.C.

69.     FIL attached to the complaint a copy of the Note that was unendorsed. Exhibit 7

70.     In response to the foreclosure complaint, Mr. Palladino contacted the Illinois Attorney General, who in turn contacted FIL.

71.      FIL offered the Palladinos' a loan modification with a significantly higher monthly payment than their current existing monthly payment.

72.     On June 18, 2008, Fremont General (the parent company of FIL) filed Bankruptcy and FIL ceased to exist.

73.     On July 11, 2008, FIL voluntarily withdrew its foreclosure complaint.

74.     On November 17, 2008, HSBC Bank USA, N.A., as Trustee Under the Pooling and Servicing Agreement dated as of November 1, 2006 for the Fremont Home Loan Trust 2006-D ("HSBC") filed a filed a foreclosure complaint in DuPage County, case # 2008 CH 4548 through Pierce and Associates, P.C.

75.     In its complaint, HSBC Bank alleged that it was the "legal holder, agent or nominee of the legal holder, of the indebtedness" and that it was the "owner, agent or nominee of the owner, of the Mortgage given as security."

76.     The Note attached to this complaint was unendorsed. Exhibit 8

77.     Mr. Palladino contacted several attorneys about defending him in the foreclosure action, however all the attorneys required a minimum $5,000.00 retainer fee.

14

78.    Mr. Palladino went to the Wheaton Law Library and after a few weeks of researching and reading was able to prepare an answer to HSBC's foreclosure complaint.

79.    On December 1, 2008, Mr. Palladino was terminated from his employment as a result of missing work.

80.    On December 15, 2008, Mr. Palladino filed his answer to the foreclosure complaint.

81.    On March 3, 2009, Mr. Palladino filed a Motion to Compel discovery.

82.    On July 10, 2009, HSBC filed its Motion for Summary Judgment, and attached a supplemental affidavit with an attached assignment alleging that MERS, as nominee for Fremont purportedly, "did hereby assign" and deliver to HSBC "prior to 11/13/08" the described mortgage "[t]ogether with all rights and interest in the same and the premises therein and the note or obligation thereby secured" and that "[t]his assignment is made without recourse and without representation or warranty" by assignor. Exhibit 9

83.    The purported fraudulent assignment was signed by Jill Rein as "certifying officer" for MERS, and was notarized by Amber Cowan. It contained a stamp which appeared to reflect that it was recorded with the Du Page County Recorder on December 17, 2008.

84.    In opposition to summary judgment, the Palladinos submitted an affidavit from Forensic accountant David P. Sweeney. He attested that under the "Pooling and Servicing Agreement Dated as of November 1, 2006, Fremont Home Loan Trust 2–6-D," Fremont was the only proper party to bring a foreclosure action in the event of default. He opined that the mortgage and note continued to be Fremont's property. Exhibit 10

85.    Following oral argument, the trial court granted HSBC Bank's motion for Summary judgment and entered a judgment of foreclosure and sale.

86.     In June, 2010, Mr. Palladino secure a job for ADT.

87.     In October of 2010, Mr. Palladino was injured at work and had to take a six month leave of absence to have hip replacement surgery.

88.     On May 31, 2011, Ms. Palladino filed an order of protection against Mr. Palladino alleging spousal abuse.

89.     Mr. Palladino was arrested and spent five days in solitary confinement in the DuPage county jail.

90.     Mr. Palladino was in constant pain as a result of his hip surgery and no medication.

91.     Mr. Palladino was able to post bail, but a restraining order was in effect which did not allow him to go home.

92.     As a result of the restraining order, Mr. Palladino had to sleep in his car for a short time.

93.     On April 6, 2011, Kropik, Papuga & Shaw entered a substitute appearance on behalf of HSBC.

94.     The Palladinos' appealed and on April 29, 2011 the Appellate court reversed the trial court's granting of summary judgment in HSBC Bank's favor and remand for further proceedings. *HSBC Bank USA, Nat. Ass'n v. Palladino*, 1 N.E.3d 666,408 Ill. App.3d 1128 (2011)

95.     On June 20, 2011, Ms. Palladino filed a Petition for Dissolution of Marriage as a direct and proximate cause of the ongoing litigation in regards to their property and the stress and strain it had caused on their marriage.

96.     On February 29, 2012, Theodore Woerthwein filed an appearance on behalf of the Palladinos'.

97.     On May 1, 2012, the Dissolution of Marriage was granted and Mr. Palladino granted was awarded sole possession of the property thus making him liable for the debts and costs incurred in regards to the property and releasing Ms. Palladino from all claims or obligations associated with the property.

98.     In November 2012, discovery was requested for the third time on behalf of Mr. Palladino.

99.     On January 18, 2013, Morris Laing Evans Brock & Kennedy filed an additional appearance on behalf of HSBC.

100.    On January 14, 2014, Prairie State Legal filed an appearance of behalf of Mr. Palladino and initiated a discovery request for the fourth time.

101.    On September 15, 2014, Justin Carter from Morris Laing Evans Brock & Kennedy produced partial discovery to Joseph Miller from Prairie State Legal.

102.    The Note provided in discovery was unendorsed and there was an unnumbered fifth page reflecting an undated stamp with the words, "Pay to the order of [blank] without recourse," with signature above the words: "Fremont Investment & Loan Doug Pollock Assistant Vice President." Exhibit 11, a true and accurate copy of the Note provided from Just Carter.

103.    On April 13, 2015, HSBC filed a Motion for Protective Order objecting to certain discovery requests alleging the documents requested was not relevant nor would it lead to the discovery of any admissible evidence.

104.    On May 1, 2015, Mr. Palladino filed an amended motion to dismiss to HSBC's complaint.

105.    On May 13, 2015, Locke Lord LLP filed an additional appearance on behalf of HSBC.

106.    On May 14, 2015 a hearing was held on Defendants Amended Motion to Dismiss.

107.    At the hearing, David Standa from Locke Lord attempted to introduce an

endorsed note and make it part of the record. See excerpt from transcript below.

> "MR. STANDA" [Counsel for Plaintiff]: "...Mr. Palladino had challenged
> the endorsement on the back of the note, they said, well, the obligation then
> was on the Plaintiff to produce the note. That is exactly why I brought the
> original note here today… [ ] The fact is the note was endorsed in blank in
> possession of the trust on the date the complaint was filed… [ ] There's a
> note that was endorsed in blank, is now especially endorsed to the Plaintiff
> that is here in front of your Honor. I'd represent to the Court that the Plaintiff
> has been in possession of the note the entire time. That establishes standing.
> There is no question. And that--That is the particular issue I want to address
> today.[ ]I understand if your Honor wants to brief me, but I would like to get
> this note back into a fire proof safe as fast as possible; and I don't want to
> have to bring it back to court. So I want to address standing today." Hrg.
> Transcr. p. 12, 13(May 14, 2015)

108.    The court denied Mr. Palladino's motion and the Court entered an order prepared

by Mr. Standa stating that Plaintiff had tendered the original note endorsed to it and that it has been

in possession of the original note throughout the pendency of the case, and has standing. Exhibit 12

109.    On May 20, 2015, Mr. Palladino filed a response to HSBC Motion for a

Protective order.

110.    June 11, 2015, Mr. Palladino filed a Motion to Clarify the May 14, 2015 order.

111.    On June 20, 2015, Mr. Palladino rescinded the transaction, by sending notice of

rescission to Fremont and Ocwen. Exhibit 13

112.    On July 17, 2015, the Court struck the portion of the order stating that HSBC had

standing, set a status date for September 16, 2015 and HSBC to produce discovery that had been

requested since March 2009. Exhibit 14

113.    In paragraph two of the order, the Court specifically ordered HSBC to produce an

affidavit as to HSBC's possession of the Note at the time of filing.

114.    On September 16, 2015, Irina Dashevsky of Locke Lord LLP, sent an email to

Jennifer Luczkowiak from Prairie State Legal and had attached to it, Plaintiff's Affidavit of Possession and corresponding exhibits, as well as Plaintiff's initial production documents, bates labeled HSBC000001-000868.the discovery pursuant to the July 17, 2015 order.

115.    The email also had attached an affidavit from Howard H. Handville attesting that Wells Fargo Bank, N.A. as Master Servicer, Trust Administrator and Swap Administrator had physical possession of the original Note on September 13, 2006. Exhibit 15

116.    The Note attached as Exhibit 1 was unendorsed.

117.    On September 17, 2015 Irina Dashevsky sent an email to Jennifer which said:

> "Hi, I just reviewed the copy of the Affidavit that I provided to you and realized that Exhibit 1 inadvertently contains an old copy of the Note, which had a blank endorsement. This is not the true and correct copy of the Note. As I mentioned earlier today, the Note has been specifically endorsed to HSBC Bank. I apologize for any confusion this may have caused. The Affidavit with the corrected exhibit is attached. Please disregard the version I transmitted earlier.
>
> To eliminate any confusion I am also sending you a hard copy of this document via U.S. Mail."

118.    Upon information and belief, Irina realized that the Note attached to the Handville was not endorsed so she switched the unendorsed Note for a Note that contained an endorsement.

119.    The 2nd affidavit from Howard H. Handville now had a Note that was now endorsed completely different from the Note on the 1st affidavit he provided. Exhibit 16

120.    On September 17, 2015, Mr. Palladinos' case was continued to November 19, 2015.Mr. Palladino, reviewed the Pooling and Servicing Agreement ("PSA") that had been tendered in discovery that he had been requesting since March 3, 2009.

121.    Pursuant to Section 2.01 in regards to Conveyance of Mortgage Loans, the PSA states the Depositor assigns and conveys to the Trustee the original Note bearing all endorsements showing a complete chain of endorsements from the originator to the last endorsee, endorsed "Pay

to the Order _____, without recourse" and signed in the name of the last endorsee by an authorized officer by the closing date. Exhibit 17

122. The Depositor for the Trust is Fremont Mortgage Securities Corporation and the closing date was November 3, 2006.

123. The assignment alleges MERS as nominee for Fremont "did" assign (past tense) the mortgage and note to HSBC Bank prior to November 13, 2008 which is two years after the November 3, 2006 closing date for the Trust.

124. Fremont Mortgage Securities Corporation is responsible for assigning loans to the Trust, **not** MERS as Nominee or Fremont as alleged in the mortgage assignment.

125. Pursuant to the PSA, the underwriting guidelines state that in order to be qualified as A+ category, the bankruptcy must have been discharged at least 24 months and the maximum debt-to-income ratio is 50%.

126. Based on the discovery that was finally tendered on September 15, 2014 and September 16, 2015, Mr. Palladino was able to discover a scheme to defraud him and steal his property.

### RICO ALLEGATIONS
### SCHEME TO DEFRAUD

127. Wells Fargo created a scheme to defraud which leveraged risk wherein the money used to fund the scheme wasn't the borrower's payments, but the purchases of various mortgage---backed (really not backed by anything) securities.

128. Wells Fargo carried out this scheme both in the origination of Mr. Palladinos' mortgage loan, the creation and administration of the Trust, and in the filing of a wrongful foreclosure in an attempt to steal Mr. Palladinos' property to make a pure profit.

129.    Upon information and belief, the scheme was carried out as follows: Mr. Palladino goes to FIL to get a loan. FIL sends him to a broker, Maywood Mortgage. Maywood Mortgage gathers all his documents and then sends the file to FIL to approve the loan. Upon information and belief, FIL pays Maywood Mortgage a fee and then wires the money to the title company to fund his loan.  Since the Palladinos' technically didn't qualify for the loan FIL approved them for, FIL had to falsify their income, assets, and violate the underwriting guidelines, HOEPA, and TILA to qualify them.

130.    FIL who plays the role of the sponsor, originator, and seller purportedly sells Mr. Palladinos' loan to FMSC, who then in turns sells the loan to Fremont Home Loan Trust 2006-D. FIL gets paid a fee for the service they have provided.  Wells Fargo, who is the master servicer, trust administrator and custodian for the trust acts like Mr. Palladinos' loan conforms to the Pooling and Serving Agreement guidelines that govern the Trust. For every payment Mr. Palladino makes, Wells Fargo receives a fee for being the master servicer, trust administer, and custodian.  Wells Fargo already anticipates Mr. Palladino is going to default on the predatory subprime loan so Wells Fargo takes out an insurance policy. (similar to life insurance)

131.    On May 5, 2008, FIL files a complaint alleging Mr. Palladino defaulted on his loan, but they voluntarily dismiss the complaint.

132.    On November 17, 2008, HSBC Bank, USA who is the Trustee for the Trust files a foreclosure complaint alleging it is the rightful owner.  When standing is challenged, under the direction of Wells Fargo, Pierce and Associates create an Assignment.

133.    The assignment is falsely executed by Jill Rein because Fremont no longer existed, Rein was not an employee for of MERS, and upon information and belief had no authority to represent MERS and MERS had not authority to represent FIL.

134.    Upon information and belief, Wells Fargo has been paid by the insurance policy it took out on Mr. Palladinos' loan and in the event the home is sold, Wells Fargo still made a profit.

135.    Upon information and belief, it is Wells Fargo's common business practice to carry out the above scheme in nearly all the foreclosures it has filed.

## THE ENTERPRISE

136.    The following persons constitute "persons" within the meaning of 18 U.S.C. § 1961 (3). Fremont Investment and Loan n/k/a Real Industry Inc. ("Fremont") and Wells Fargo Bank, N.A. ("Wells Fargo").

137.    Each person above was and is responsible for operating and managing the business affairs of the enterprise described herein.

138.    For instance, as alleged herein, Defendant Wells Fargo authorized HSBC as Trustee to authorize a foreclosure against Mr. Palladino and the Law Firms to represent the Trust in a foreclosure action. Wells Fargo also directed the servicers to impose and collect improper fees and assist in filing false mortgage papers to effectuate the false foreclosure.

139.    In addition, the Defendant Fremont authorized Maywood Mortgage to collect the Palladinos' documents to submit to FIL so FIL would fund it.

140.    These activities, described above, also describe the manner with which each Defendant conducted the affairs of the association in fact enterprise enumerated herein.

141.    In order to foreclose on property belonging to Mr. Palladino, Defendants employed a system that asserted demonstrably false claims, namely the documentation that Defendants relied upon to effectuate the foreclosure did not show a viable chain of title.

142.     Collectively, the Trust (Fremont Home Loan Trust 2006-D), the Depositor (Fremont Mortgage Securities Corp.), the Trustee ("HSBC Bank USA, N.A.) the Servicers (Defendant Ocwen and Litton), the Law Firms ("Pierce and Associates, P.C., Locke Lord LLP") constitute an enterprise engaged in and whose activities affect interstate commerce. All of the enterprises described in this paragraph are an "individual, partnership, corporation, association, or other legal entity" and are therefore valid enterprises within the definition of § 1961(3) of the RICO Act.

143.     The enterprise has existed since 2006, when the Trust was allegedly created.

### PATTERN OF RACKETEERING AND PREDICATE ACTS

144.     Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343(relating to wire fraud). As set forth below, Defendants have engaged, and continue to engage, in conduct violating each of these laws to effectuate their scheme.

145.     The pattern of racketeering activity, as evidenced by the predicate acts, began in at least 2008, which is when the FDIC and other authorities cited in this Complaint evidence that Fremont's unfair and deceptive origination loans and Wells Fargo's robo-signing and other improper and illegal servicing and foreclosure practices were occurring.

146.     The pattern of racketeering activity has a viable threat of continuity, because Wells Fargo continues to service not only the loans currently held by the Trust, but loans that may or may not be held in other trusts and they are continuing to make huge profits.

## VIOLATIONS OF §1341 AND §1343, MAIL AND WIRE FRAUD

147. Defendant Wells Fargo agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the scheme of defrauding Mr. Palladinos' property.

148. For purposes of executing and/or attempting to execute the above described scheme to fraudulently foreclose upon Mr. Palladinos' property, the Defendants, in violation of 18 U.S.C. §1341, placed or caused to be placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial and interstate carriers, including but not limited to falsified, fraudulent, and legally defective documents.

149. The practices described in this complaint could not have occurred without the use of the U.S. Mail and various wires including telephones and the Internet. The overwhelming majority of the evidence of these mailings and wires are in the possession of the Defendants and are not public documents. However, specific instances of such fraudulent mails and/or wires regarding Mr. Palladinos mortgage include all of the court filings that included the fraudulent endorsed note.

## AIDING AND ABETTING

150. Pierce & Associates and Locke Lord have aided and abetted Wells Fargo in the scheme to defraud Mr. Palladino in an attempt to steal his property and the courts by falsify documents, attesting to their authenticity, making false statements to the court knowingly their actions were false in order to cover the scheme by Wells Fargo in regards to standing and who owns the Note.

## COUNT I
### VIOLATION OF RICO 18 U.S.C. § 1962(c)
### (HSBC, Wells Fargo, Fremont, and the Enterprise)

151.    Mr. Palladino incorporates all preceding paragraphs as if fully set forth herein.

152.    In violation of 18 U.S.C. §1962(c), Wells Fargo, Fremont and the Enterprise conducted, or participated in the conduct of an enterprise through a pattern of racketeering activity and through the use of wire and mail by: 1) filing a foreclosure against Mr. Palladino despite its lack of interest in the mortgage and Note; 2) drafting and filing a fraudulent mortgage assignment thus misrepresenting his loan had been properly assigned to the Trust and serving it upon him; 3)   giving him a predatory loan and fraudulently concealing this information because the PSA underwriting guidelines confirmed that the loan violated the debt-to-income ratios and bankruptcy discharge seasoning allowed by the PSA; and by foreclosing on his home even though they had no right to.

153.    Mr. Palladino has been injured because he has to incur attorney fees in excess of $80,000.00 to defend the foreclosure based on the Defendants scheme to defraud him and take his property.

WHEREFORE, Mr. Palladino respectfully requests that this Honorable Court grant:

(1) Statutory damages;

(2) Litigation expenses and costs of suit;

(3) Punitive Damages;

(4) Set off or Recoupment;

(5) Treble Damages;

(6) Attorney fees and

(7) Such other or further relief as the Court deems proper.

## COUNT II
### Violation of the Federal RICO Act, 18 U.S.C. §1962(d)
### ((HSBC, Wells Fargo, Fremont, and the Enterprise)

154.    Mr. Palladino incorporates all preceding paragraphs as if fully set forth herein.

155.    Defendants conspired to originate a predatory loan, one that was bound to default and lead to foreclosure. The Defendants Wells Fargo, Pierce and Associates, Locke Lord, and Ocwen conspired to draft and execute a false assignment and endorsement in the foreclosure proceedings to seize Mr. Palladinos' property. This conspiracy violates 18 U.S.C. § 1962(d).

156.    Specifically, the Defendants conspired with the Law Firms and the servicers to use the Enterprise via the DuPage County Court to file a wrongful foreclosure and to fabricate documents in an attempt to steal Mr. Palladinos' property. Defendants conspired to utilize this illegal scheme to enrich themselves at Mr. Palladinos' expense.

157.    The Defendants intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity. Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

158.    Defendants are therefore liable to Mr. Palladino under the federal RICO Act.

WHEREFORE, Mr. Palladino respectfully requests that this Honorable Court grant:

(1) Actual damages;

(2) Litigation expenses and costs of suit;

(3) Punitive Damages;

(4) Treble Damages;

(5) Attorney fees; and

(6) Such other or further relief as the Court deems proper.

## COUNT III
### *Civil Conspiracy*

159.    Mr. Palladino incorporates all preceding paragraphs as if fully set forth herein.

160.    This claim is against HSBC, Wells Fargo, Fremont, Peirce and Associates, Ocwen and Locke Lord.

161.    Defendants Wells Fargo conspired with Fremont to arrange and produce a loan that Mr. Palladino could not afford by falsifying the 1003 loan application.

162.    Wells Fargo then conspired with HSBC to file a foreclosure action against Mr. Palladino by retaining the Law Firm of Pierce and Associates.

163.    Because HSBC did not have the proper documentation to file its complaint, HSBC and Wells Fargo together conspired with Pierce and Associates to create a fraudulent assignment and endorsed note.

164.    Defendants conspired out of excessive concern for their own fees, profits, and corporate greed to misrepresent and conceal who the actual owner of Mr. Palladino's loan is.

165.    Mr. Palladino has been damaged as a result by incurring attorney fees in excess of $80,000.00, and emotional distress.

WHEREFORE, Mr. Palladino respectfully requests that this Honorable Court grant:

(1) Actual damages;

(2) Litigation expenses and costs of suit;

(3) Punitive Damages;

(4) Treble Damages;

(5) Attorney fees; and

(6) Such other or further relief as the Court deems proper.

## COUNT IV
### *Aiding and Abetting*
### *Pierce & Associates and Locke Lord*

166.   Mr. Palladino incorporates all preceding paragraphs as if fully set forth herein.

167.   Pierce and Associates and Locke Lord knowingly induced, participated and assisted HSBC and Wells Fargo in actively and deliberately defrauding Mr. Palladino and the Courts through the fraudulent assignments and fabricated endorsed Note.

168.   As a result of the above Defendants aiding and abetting Wells Fargo and HSBC's fraudulent assignment and endorsements, Mr. Palladino has been in active litigation for over seven years and has suffered severe financial and emotional distress.

WHEREFORE, Mr. Palladino respectfully requests that this Honorable Court grant:

(1) Actual damages;

(2) Litigation expenses and costs of suit;

(3) Punitive Damages;

(4) Treble Damages;

(5) Attorney fees; and

(6) Such other or further relief as the Court deems proper.

## COUNT V
### *Truth in Lending Act (Rescission)*
### *Fremont and Ocwen*

169.   Mr. Palladino incorporates all preceding paragraphs as if fully set forth herein.

170.   This consumer credit transaction was subject to Mr. Palladinos' right of rescission as described by 15 U.S.C. §1635 and Regulation Z § 226.23 (12 C.F.R. § 226.23)

171   Mr. Palladino has a continuing right to rescind the transaction until the third business day after receiving all material disclosures, up to three years after consummation of the

transaction, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3).

172. On June 20, 2015, Mr. Palladino rescinded the transaction, by sending notice of rescission to Fremont and Ocwen.

173. More than 20 calendar days have passed since Defendants received Plaintiff's notice of rescission.

174. Defendants have failed to take any action necessary or appropriate to reflect the termination of any security interest created by the transaction, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

175. Defendants have failed to return to Plaintiff any money or property given by Mr. Palladino to anyone, including Defendants, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

176. Defendant Ocwen, as servicer is also liable pursuant to 15 U.S.C. § 1641.

177. As a result of these violations of the Truth in Lending Act and Regulation Z, Defendants are liable to Plaintiff for:

a. Rescission of the transaction pursuant to 15 U.S.C. §1635(b).

b. Termination of any security interest in Plaintiff's property created by the transaction pursuant to 15 U.S.C. §1635.

c. Return of any money or property given by the Plaintiff to anyone, including Defendants, in connection with this transaction, under 15 U.S.C. § 1635(b).

d. Statutory damages of $2000 for Defendants' failure to respond properly to Plaintiff's rescission notice pursuant to 15 U.S.C. § 1640(a)(2)(A).

e. Forfeiture of return of loan proceeds under 15 U.S.C. § 1635.

f. Actual damages in an amount to be determined pursuant to 15 U.S.C. § 1640.

29

g. Costs in accordance with 15 U.S.C. § 1640.

WHEREFORE, Mr. Palladino requests the following relief:

        (1) Declaratory and/or injunctive relief rescinding the mortgage on Mr.

Palladinos' home upon such terms as the court determines;

        (2) Termination of the Security interest;

        (3) Return any money or property given by Mr. Palladino, including

Defendants in connection with this transaction

        (4) Actual damages in an amount to be determined by the court; and

        (5) Statutory damages in the amount of $2000.

        (6) Reasonable attorney fees.

**COUNT VI**
*Home Ownership Equity Protection Act ("HOEPA")*
*Fremont and Ocwen*

178.    Mr. Palladino incorporates all preceding paragraphs as if fully set forth herein.

179.    In 1994, Congress enacted the Home Ownership Equity Protection Act

("HOEPA") which is codified at 15 USC sec. 1639 et seq. with the intention of protecting

homeowners from predatory lending practices targeted at vulnerable consumers. HOEPA requires

lenders to make certain defined disclosures and prohibits certain terms from being included in

home loans. In the event of noncompliance, HOEPA imposes civil liability for rescission and

statutory and actual damages.

180.    Plaintiff is a "consumer" and Defendants Fremont and Ocwen are "creditors" as

defined by HOEPA.

181.    Defendants Fremont and Ocwen violated HOEPA by numerous acts, material

omissions, and a pattern of fraudulent concealment, including but not limited to engaging in a

pattern and practice of extending credit to the Palladinos' without regard to their ability to repay in violation of 15 USC sec. 1639(h).

182.     By virtue of the Defendants' Fremont and Ocwen violations of HOEPA, Mr. Palladino has a legal right to rescind the consumer credit transaction the subject of this action pursuant to 15 USC sec. 1635.

183.     Defendants Fremont and Ocwen further violated HOEPA by failing to make additional disclosures, including but not limited to the failure of said Defendants to provide an accurate TIL disclosure which failure was executed through a pattern of fraudulent concealment and intentional nondisclosure.

184.     As a direct consequence of and in connection with Plaintiffs' legal and lawful exercise of their right of rescission, the true "lender" and its agents, including Defendant Ocwen and, to the extent necessary, Defendant Fremont, is required, within twenty (20) days of this Notice of Rescission, to:

(a) desist from making any claims for finance charges in the transaction;

(b) return all monies paid by Plaintiffs in connection with the transaction to the Plaintiff;

(c) satisfy all security interests, including mortgages, which were acquired in the transaction.

185.     Upon the true "lender's" full performance of its obligations under HOEPA (including any necessary actions of Defendants Fremont and Ocwen as agents of the lender), Plaintiff shall tender any sums to which the true lender is legally entitled.

WHEREFORE, Mr. Palladino requests the following relief:          :

(1) rescission of the mortgage loan transactions;

(2) termination of the mortgage and security interest in the property the subject of the mortgage loan documents created in the transaction;

(3) return of any money or property paid by the Plaintiffs including all payments made in connection with the transactions;

(4) an amount of money equal to twice the finance charge in connection with the transactions;

(5) relinquishment of the right to retain any proceeds; and

(6) actual damages in an amount to be determined at trial, including attorneys' fees.

## COUNT VII
### *Home Ownership Equity Protection Act ("HOEPA")*
### *(Disclosure Statement)*
### *Fremont*

186.    Mr. Palladino incorporates all preceding paragraphs as if fully set forth herein.

187.    The Truth in Lending Disclosure statement provided at the August 28, 2006 disclosed an amount financed of $309,690.50, a finance charge of $666,097.23, an annual percentage rate of 9.32% and a security interest in the property.

188.    The payment schedule is shown below:

| Payments | Payment | Payments Begin |
|----------|---------|----------------|
| 36 | $1,567.50 | 11/1/06 |
| 323 | $2,553.14 | 11/1/09 |
| 1 | $2,551.12 | 10/1/36 |

189.    However, the loan was an adjustable rate mortgage interest at 7.19% until September 2009 when the interest rate was subject to change every six months, up to a maximum of 13.19%.

190. HOEPA loans whose interest rates are not fixed must disclose "the amount of the maximum monthly payment, based on the maximum interest rate." 15 U.S.C. § 1639(a)(2)(B)

191. The rate was scheduled to increase after three years, and then change every six months thereafter. The correct disclosure is shown below.

| Payments | Payment amount | Rate |
|----------|----------------|------|
| 1-36 | $1,879.39 | 7.19% |
| 37-42 | $2,845.96 | 10.19 |
| 43-48 | $3,189.19 | 11.69% |
| 49-360 | $3540.53 | 13.19 |

192. Fremont's failure to give the Palladinos' the material disclosures as required by TILA violates 15 U.S.C. § 1638, entitling Mr. Palladino to actual and statutory damages under 15 U.S.C. § 1640(a) and extending the right to rescind until proper delivery of all material disclosures.

WHEREFORE, Mr. Palladino requests the following relief:

(1) Rescission of the transaction, including a declaration that Mr. Palladino is not liable for any finance charges or other charges imposed by Fremont;

(2) A declaration that the security interest is void;

(3) Return any money or property given by Mr. Palladino, including Defendants in connection with this transaction

(4) Actual damages in an amount to be determined by the court; and

(5) Statutory damages in the amount of $6,000 (consisting $2,000.0 for disclosure violation, $2,000 for failure to rescind, and $2,000 for lending without an ability to repay.                    (6) Reasonable attorney fees.

## COUNT VIII
### Violations of the Illinois Consumer Fraud Act (Deceptive)
### HSBC, Fremont, Wells Fargo, Pierce & Associates, Ocwen and Locke Lord
### Defendants

193.    Mr. Palladino incorporates all preceding paragraphs as if fully set forth herein.

194.    Defendants violated 815 ILCS 505/2 by engaging in unfair acts and practices to collect a superseded debt.

195.    It was deceptive for Defendants to do the following:

    a) try and make an mortgage assignment and endorsed Note part of the record after the complaint was
       filed;
    b) to falsify an affidavit alleging HSBC had been in possession of the endorsed Note since the filing of the foreclosure complaint;
    c) to qualify the Palladinos' for a loan they could not afford by violating the guidelines in the prospectus;
    d) to file a wrongful foreclosure when HSBC knew it did not have standing;
    e) to violate the mortgage settlement and the Residential Mortgage License Act by using signature stamps;
    f) by failing to send the affidavit back to the affiant for re-execution; and
    g) to prolong the foreclosure along for the last nine years and causing Mr. Palladino to have to pay over $80,000.00 in attorney fees and costs.

196.    Mr. Palladino has been in constant fear and worry of losing this home which has sentimental value to him and his family.

197.    Defendants scheme caused Mr. Palladino substantial damage in that, among other things: (a) he has lost his wife, (b) credit has been damaged, (c) and he has suffered severe emotional distress.

198.    Defendants conduct occurred in the course of trade or commerce.

199.    Defendants engaged in unfair conduct by violating the public policy of Illinois and the federal guidelines enacted by Congress.

200.    Defendants actions were the proximate cause of the damages to Mr. Palladino and he has injured because he has incurred legal costs and fees to defend a foreclosure action.

34

201.    An award of punitive damages is appropriate because Defendants conduct was outrageous, willful, and wanton, and it showed a reckless disregard for the rights of Mr. Palladino over the nine year period.

WHEREFORE, Mr. Palladino respectfully requests that this Honorable Court:

(1) Statutory damages;

(2) Litigation expenses and costs of suit; and

(3) Punitive Damages

(4) Such other or further relief as the Court deems proper.

## COUNT IX
### Intentional Infliction of Emotional Distress
### HSBC, Fremont, Wells Fargo, Pierce & Associates, Ocwen and Locke Lord Defendants

202.    Mr. Palladino incorporates all preceding paragraphs as if fully set forth herein.

203.    The four elements of this tort are (1) extreme and outrageous conduct by the defendant; (2) intent by the defendant to cause, or a reckless disregard of the probability of causing, emotional distress; (3) severe or extreme emotional distress suffered by the plaintiff; and (4) an actual and proximate causal connection between the emotional distress and the defendant's outrageous conduct. *Debolt v. Mutual of Omaha*, 56 Ill.App.3d 111, 371 N.E.2d 373, 13 Ill. Dec. 656 (3d Dist. 1978).

204.    Defendants conduct alleged herein, specifically the willful and knowingly fraudulently scheme to falsify the loan application, TILA, debt-to-income ratios, assignment, and produce an endorsed note all in an effort to steal Mr. Palladinos' home caused him severe and emotional distress.

205.    As a result of Defendants conduct, Mr. Palladino endured severe and extreme emotional distress that resulted in stress, jail time, anxiety and a judgment for dissolution of marriage.

206.     As a direct and proximate result of Defendants willful and wanton conduct Mr. Palladino

suffered emotional distress, monetary losses and has been damaged in excess of $300,000.00.

WHEREFORE, Mr. Palladino respectfully requests that this Honorable Court:

(1) Actual damages;

(2) Litigation expenses and costs of suit;

(3) Punitive Damages for Defendants willful and wanton conduct; and

(4) Such other or further relief as the Court deems proper.

**JURY DEMAND:** Mr. Palladino demands a trial by jury.

Respectfully submitted,

By: /s/ Herbert Hill
One of Mr. Palladinos' Attorneys

Herbert Hill
The Law Office of Herbert Hill
605 N. Broadway
Aurora, Illinois 60505
Atty No: 1214853
P:  630-906-5571